**NATIONAL PAPAYA COMPANY,**
Plaintiff-Appellee,

v.

**DOMAIN INDUSTRIES, INC.,**
Defendant-Appellant.

No. 77–1003.

United States Court of Appeals,
Fifth Circuit.

April 4, 1979.

Edward M. Waller, Jr., Tampa, Fla., for defendant-appellant.

William E. Hahn, T. Paine Kelly, Jr., Tampa, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, TUTTLE and HILL, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This case essentially is a commercial whodunit: who (or what) caused National Papaya Company (NPC) to lose a quarter of a million dollars in profits over a period of several years? The victim, NPC, claims that the culprit is Domain Industries, Inc. According to NPC, Domain perpetrated the dastardly deed by breaching implied and express warranties in connection with the sale of an item of production machinery to NPC. As a result of the machine's deficient performance, NPC claims that it experienced repeated and protracted delays in filling orders for its customers, and that those delays in turn caused it to lose sales, and hence profits as well. Domain admits its villainy in breaching its warranties, but denies responsibility for the damage. Its position is that NPC's late deliveries and lost sales are attributable instead to a variety of other factors.

The District Court played the role of Sam Spade. Sitting without a jury, the Court determined that NPC's theory of the case was correct and awarded NPC $250,772.33 as lost profits damages. We cannot agree. Although we are well aware of our limited abilities and responsibilities as arm-chair detectives, we find that certain findings or assumptions essential to the District Court's determination were clearly erroneous. But because we believe that the evidence before the Court would support a conclusion that Domain's breach of its warranties legally caused NPC to lose profits, in some yet to be determined amount, we do not reverse outright, but instead vacate the award of lost profits damages and remand for a new trial as to consequential damages. In all other respects, to be discussed in the course of our opinion, we affirm the judgment of the District Court.

### The Deed

NPC is a Florida corporation engaged in the food processing and packing business. It was principally involved with canned foods until 1969, when it switched to the specialty and health food trade, concentrating on fruit juices, jellies, and papaya concentrate. The health food industry began to expand rapidly in late 1970, and NPC soon found it difficult to meet the increased demand for its products with its existing production line. Its president, W. Kenneth Barnes, Jr., therefore decided sometime in 1971 to replace the plant's entire production line in order to increase production capacity.

Of the various components in NPC's production line, perhaps the most important is the "filler"—the machine that fills containers with the food product. NPC's old filler had a maximum production capacity of 30–

35 cpm (containers per minute). Based on his experience in the business, Barnes concluded that a filler with a capacity of 55–60 cpm would be necessary to supply existing orders and those expected in the near future on a timely basis. In addition, business projections indicated that the new production line should be capable of attaining a maximum output of 100 cpm for quart-sized containers.

Through discussions with a sales agent, Barnes was directed to M.R.M. Company, Inc. (MRM), a manufacturer of packaging machinery and predecessor in interest to the defendant-appellant, Domain Industries, Inc. MRM was provided with NPC product samples, containers, and production temperatures to assist it in determining whether it could manufacture a filler meeting NPC's specifications. With full knowledge of NPC's products and requirements, MRM represented to Barnes that its Standard Frame Versa-Fil would meet those requirements,[1] and in particular that it would maintain a production rate of 100 cpm with a fill-accuracy of one-half of one percent. Based on these representations, Barnes agreed to purchase the Standard Frame Versa-Fil in November 1971.

The first price quotation provided NPC specified delivery in June 1972, which was unacceptable to Barnes. At his insistence, a new purchase agreement was sent Barnes with a revised delivery date of "third or fourth week of February, 1972." The revised purchase agreement was signed by Barnes and a representative of MRM in December 1971. The purchase price was approximately $18,000.[2]

It soon became evident that the filler could not be delivered according to schedule. Defendant Domain Industries, which acquired MRM about the time of the sale, has not offered any justifications for the delay and resultant contract breach. On April 3, 1972, Domain advised Barnes that the Standard Frame Versa-Fil was not capable of performing as represented—specifically, that it was not capable of accommodating a square quart container under each of its twelve spouts. Domain instead recommended its Large Frame Versa-Fil. Because NPC by now had a backlog of orders secured on the assumption of receiving a new filler in late February, Barnes, for lack of a better alternative, agreed to take the standard filler on a consignment basis with the stipulation that Domain immediately begin fabricating a Large Frame Versa-Fil.

Still, the standard frame filler originally ordered was not delivered until May 8, 1972. Upon its arrival NPC immediately dismantled its old production line only to discover, on May 10, that certain essential parts were missing and that the filler, as shipped, was inoperable. The next two months were spent awaiting delivery of additional parts, installing the new filler, and making the various adjustments now discovered necessary for its operation.

In the meantime, NPC had ordered other equipment from various manufacturers to complete its new production line. NPC had attempted to coordinate the shipments of this other equipment with the late-February delivery date of the filler in order to install its new production line and increase capacity as quickly as possible with a minimum of shut-down time, but these efforts proved to be in vain. Not only was delivery of the filler delayed, but none of the other items arrived according to schedule either. As the other items were shipped and delivered to NPC between February 29 and May 3, 1972, they were installed and incorporated in NPC's then-existing production line. As of May 3, only the filler and a new pasteurizer had not been shipped to NPC.

1. While there is some question as to whether honey was ever mentioned by NPC, the District Court found that honey was a product represented by MRM in its sales brochures to be compatible with the Versa-Fil. There is no question that MRM was fully apprised of NPC's other products—such as jams, jellies, spreads, juices, papaya concentrate, and salad dressings—when it recommended its Standard Frame Versa-Fil.

2. Since appellant Domain Industries does not contest the District Court's determination of liability, there is no need to review the provisions of the purchase agreement that purport to disclaim or limit warranties.

The new pasteurizer, which was needed for increased production of juices and papaya concentrate, did not arrive until after delivery of the filler and was not installed until May 31, 1972.

Nonetheless, it was principally the delay in delivery and installation of the filler that prevented NPC from increasing its production to meet the increased demand for its product. And even after July 10, 1972, when the filler had finally been installed and was ready for production, its speed and accuracy of fill fell far short of the warranted levels. The maximum production speed of the new filler ranged from 22 to 40 cpm depending on the particular product, and the filling inaccuracy was as great as 8%. To make matters worse, Domain did not begin construction of the large frame filler until September or October of 1972, approximately six months after it had notified Barnes that the standard frame filler would be inadequate. Thus, for the six months between July 1972 and January 1973 when the replacement Large Frame Versa-Fil was finally delivered, NPC had to make do with a filler that Domain conceded could not perform according to Domain's warranties.

The large frame filler was installed with comparative ease, but testing soon revealed that it was overfilling or underfilling too many containers. During the next month, Domain representatives made certain adjustments which improved the accuracy of the fill but decreased the speed of the machine. The parties dispute the precise performance record of the new filler after these adjustments had been made, but it is undisputed that the machine's performance failed to meet not only the warranted 100 cpm but also the minimum requirements (55–60 cpm with guaranteed accuracy) estimated by Barnes as necessary to satisfy existing orders in a timely fashion, and in effect warranted by Domain.

In March of 1973 Domain advised Barnes that nothing more could be done or would be done to improve the filler's production performance. Domain further advised Barnes either to return the filler immediately or to rent it at a rate of $1,000 per month (later changed to $300 per month) until Barnes was able to obtain a replacement from some other manufacturer. NPC decided to retain the Versa-Fil until another filler could be procured. It was not until January 1974 that NPC was able to obtain and install a Pfaudler filler, at which time it returned the Versa-Fil to Domain.

### Spade's Solution

The District Court found that Domain was liable to NPC under various provisions of the Uniform Commercial Code, as adopted and interpreted in Florida, for breach of both express and implied warranties. Domain does not challenge this determination—indeed, it conceded its liability at oral argument—and we therefore affirm on the issue of liability.

As a result of the breached warranties, NPC claimed both incidental and consequential damages. The Court awarded NPC incidental damages of $4,799.35,[3] a determination which Domain also does not challenge. Domain does, however, contest—quite strenuously—the Court's consequential damages award of $250,772.33 for lost profits. Domain does not seriously dispute the fact that NPC lost business to established customers during the period in which NPC was using its fillers. Nor does it seriously dispute the amount of lost profits as found by the District Court. Its argument instead is that NPC failed to prove to a reasonable certainty that these lost profits were caused by the failure of its fillers to perform as warranted.

### The Law

■ As an initial matter, it is clear that Florida law provides for the recovery of lost

---

3. This figure represents the difference between (a) the purchase deposit and other out-of-pocket expenses incurred by NPC in connection with the substandard fillers, which totaled

$8,099.35, and (b) the agreed-upon monthly rental rate for the second Versa-Fil during the eleven months it was used by NPC, which totaled $3,300.00.

profits in a "proper case."[4] Although the general rule is "that the anticipated profits of a commercial business are too remote, speculative, and dependent upon changing circumstances to warrant a judgment for their loss," *New Amsterdam Cas. Co. v. Utility Mfg. Co.,* 1935, 122 Fla. 718, 166 So. 856, 860, such damages can be recovered where "the loss of prospective profits is the natural result of the wrong and the amount can be established with reasonable certainty," *Conner v. Atlas Aircraft Corp.,* Fla. Dist.Ct.App., 1975, 310 So.2d 352, 354. "The standard for the degree of certainty requires that the mind of a prudent impartial person be satisfied with the damages." *Id.*

■■■ Despite the element of conjecture inherent in any proof of anticipated profits, an inability to establish the amount of damages with absolute exactness will not defeat recovery. *E. g., Twyman v. Roell,* 1936, 123 Fla. 2, 166 So. 215. But Florida case law indicates that less uncertainty is tolerated with regard to the plaintiff's burden in showing that the lost profits damages flowed as the natural and proximate result of defendant's wrongful conduct. "The uncertainty which defeats recovery in such cases has reference to the cause of the damage rather than to the amount of it." *Twyman v. Roell, supra,* 166 So. at 218.

### The Appeal

Relying on this relatively strict burden of proof with respect to causation, Domain contends that the damage award for lost profits must be reversed. Its argument in capsule form is that numerous other factors have played such significant roles in NPC's

sales history that any conclusions regarding the effect of the deficient fillers on NPC's sales are impermissibly speculative and conjectural.

To address this argument requires us to review in some detail the evidence presented by NPC on the issues of damages and causation, the findings made by the District Court, and a number of Domain's objections both to the Court's findings and to the assumptions upon which its award of lost profits damages are predicated. Our review of the evidence is of course circumscribed by our role as an appellate court. Thus, we adopt all findings of fact made by the District Court that are not clearly erroneous; we make all credibility choices in favor of NPC; and, where it is necessary to draw certain inferences in order to justify given findings of fact or the ultimate damages award, we likewise draw them in favor of NPC unless the evidence presented at trial clearly will not warrant doing so.

### The Pudding: NPC's Damage Summaries and Underlying Assumptions

The crux of NPC's case regarding lost profits and causation consisted of a series of "damage summaries," which NPC introduced into evidence and which the District Court eventually adopted in rendering its judgment. These summaries purport to track each order placed with NPC by each of seven established customers[5] between March 1, 1972 and March 31, 1974; the length of the delay, if any, that NPC experienced in filling each order or the amount of the order that NPC never was able to

---

4. *See, e. g., Twyman v. Roell,* 1936, 123 Fla. 2, 166 So. 215; *Conner v. Atlas Aircraft Corp.,* Fla.Dist.Ct.App., 1975, 310 So.2d 352; *Aldon Indus., Inc. v. Don Myers & Associates, Inc.,* 5 Cir., 1975, 517 F.2d 188, 190–91.

Fla.Stat. § 672.2–714, which sets out the buyer's damages for breach in regard to accepted goods, provides, in pertinent part:
　(3) In a proper case any incidental and consequential damages under the next section may also be recovered.
The next section, Fla.Stat. § 672.2–715, defines one form of consequential damages to be
　(a) Any loss resulting from general or particular requirements and needs of which the

seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise * * *.

5. During trial, the District Court ruled, in accord with the governing principles of Florida law on lost profits damages, that NPC could not introduce evidence of lost sales to customers with which it was not doing business in 1971 and 1972. NPC's claim for damages, and the Court's ultimate award, is therefore limited to those profits lost on orders from established customers of NPC as of early 1972, which NPC was unable to fill in a timely fashion.

fill; and the volume of lost sales occasioned by the lateness of delivery or NPC's inability to fill the entire order.

The validity of the summaries as a reasonably accurate account of the lost profits caused by the deficient performance of Domain's fillers depended in large measure upon the validity of certain underlying assumptions. The most important of these assumptions were the following:

■ Every delay NPC experienced between March 1, 1972 and March 31, 1974 in filling and shipping orders to established customers was caused by Domain's fillers. The starting date of March 1, 1972 was of course the approximate date the Small Frame Versa-Fil was to have been delivered. March 31, 1974 was chosen as the terminal date, even though NPC had received and installed the replacement Pfaudler filler in January 1974, on the theory that the two extra months of February and March had been necessary to fill orders that had become overdue during production with the Large Frame Versa-Fil.

■ Every shipment made by NPC more than two weeks after the order was placed constituted a "late delivery."

■ Every "late delivery" caused the customer to suffer an "out-of-stock condition," which in turn was related to lost sales because an "out-of-stock condition" would prompt a customer to take its business elsewhere if possible.

■ With regard to many of the products NPC packed for its established customers, lost sales could be determined according to a "case movement" calculus. The theory of this somewhat complicated calculus was that for each late delivery on a particular order to which the calculus was applicable, NPC lost sales equal to (a) NPC's current price per case for that product, times (b) the number of NPC-packed cases of that product that that customer was turning over per week, times (c) the number of weeks NPC was late delivering that particular order.[6]

■ Where there were no previous orders upon which to base a customer's specific "case movement" rate of a particular product (see assumption [4], *supra*), lost sales on a late delivered order could nonetheless be calculated on the assumption that at a minimum a customer would "turn" 12½ cases per week.[7] Thus, if NPC delivered an order 2 weeks late, it could be assumed that the delay had caused NPC to lose 25 cases worth of sales of that product (2 weeks times 12½ cases per week).

■ If an order specifies shipments of a product over a certain period of time, any shipments of that product made subsequent to that period were not made pursuant to that order and NPC lost sales equivalent to the number of cases that were not filled and shipped within the requested time period.[8] For example, if a customer ordered

---

6. The following is an expanded account of how this "case movement" calculus was used to determine the sales NPC lost on any particular order ($X$) that it was late in delivering to a customer: The first step was to determine the number of weeks between the date that customer had last received a shipment of that product and the date on which it requested delivery on order $X$. This number of weeks was then divided into the number of cases the customer had received on the preceding shipment. The resulting figure theoretically represented the number of NPC-packed cases of that product that the customer was selling to retailers or consumers on a weekly basis. The next step was to multiply this case-per-week ("case movement") figure by the number of weeks by which NPC was late in filling and delivering order $X$ to the customer. This figure theoretically represented the number of NPC-packed cases that the customer would have used but did not use because of the late delivery. Multi-plying this case number by NPC's current price-per-case yielded the total sales NPC theoretically lost on order $X$.

7. This assumption was based on testimony that the general practice in the food industry was to "turn" an entire inventory between 16 and 20 times per year. Deliberately taking a conservative estimate, however, NPC adopted a minimum turnover rate of 13 "turns" per year, or one "turn" every 4 weeks. On the further assumption that the average initial order of a product was 50 cases, this yielded the conclusion that a customer would "turn," at a minimum, 12½ cases per week.

8. This represents an alternative approach to damages, applicable only to certain unfilled orders, from that embodied by assumptions [2], [4], and [5].

1,000 cases for delivery over a period of one year, beginning January 1, 1973, and NPC filled and shipped only 750 cases during 1973, it lost sales of 250 cases on that order, even though it subsequently shipped 200 cases in February 1974 and there is no evidence of any other order to which that 200 case shipment might be applied.

■ Lost profits equaled 21.68% of the total of lost sales. This figure represents the net profit of NPC, after deducting all overhead costs, between March 1, 1972 and January 31, 1976.

### The Proof(?)

Much of the evidence introduced by NPC at trial was directed towards justifying these assumptions. For example, with respect to the "out-of-stock condition" phenomenon (see assumption [3], *supra*), NPC called an expert in marketing research and the marketing of food products, who testified that it was extremely important for retailers to have their shelves stocked, since a fresh and plentiful supply breeds consumer confidence and stimulates constant demand, while an out-of-stock condition or dwindling supply causes the customer to go elsewhere. Although the effect of this out-of-stock condition is more acute at the retail level, he testified that it affects the demand for the product up through the chain of distribution. This expert also reviewed NPC's damage summaries and testified that they depicted the existence of a serious out-of-stock condition for the customers supplied by NPC and that in his opinion this condition caused a decline in the demand for NPC's products.[9]

This expert's testimony was corroborated in large part by Sidney Epstein, President of the New York brokerage firm used by NPC to broker its products to various distributors and retailers. Mr. Epstein testified that the regular customers to which he sold NPC's products continually complained to him about NPC's poor delivery record,

that NPC unquestionably lost sales as a result of the frequent delays in delivery and out-of-stock conditions, and that if deliveries had been timely he could have sold everything that NPC could have produced during the critical years.

Mr. Epstein also testified concerning what constituted a late delivery (see assumption [2], *supra*). According to him, the industry standard—and the expectation of the distributors with which he dealt— was that orders were to be filled within two weeks of the date the order was placed.

Representatives from each of NPC's major customers were in general agreement with this conclusion; most of them testified that they expected to receive orders within two weeks after they had been placed. They also all testified that from 1972 to 1974 they had experienced difficulties in obtaining timely deliveries from NPC and that because of these delays, they had either curtailed or stopped altogether their business with NPC with regard to some or all product lines.

NPC also introduced the testimony of Harry Scherwinski, a certified public accountant who was familiar with the books and records of NPC, to substantiate the accuracy of its damage summaries. Mr. Scherwinski testified that he had verified many of the figures used in the summaries as well as the calculations used to arrive at the total lost sales. In his opinion, the approaches used by NPC in the damage summaries were in accord with sound, generally accepted accounting principles, and that if there were individual errors in the summaries, they would be of small consequence because of the "ultraconservative" method used in computing the damages.

Domain also called a certified public accountant, William Walton, to testify. Walton stated that he had not had time to verify NPC's damage summaries, but that it would be relatively easy to do so by comparing the data they contained with the

---

**9.** This expert further testified that NPC's delivery record between 1972 and 1974 was so poor, resulting in such severe out-of-stock conditions for its customers, that had NPC been in the

general grocery trade and not in the booming health food specialty trade, it probably would have gone out of business.

original purchase orders, shipping invoices, and production records, and by checking the mathematical accuracy of the various computations. Unaware of any errors in the summaries, he stated that the calculations of lost sales as reflected in the summaries would be perfectly valid, provided that the underlying assumptions were valid. But he expressed no opinion on this critical question of the validity of the assumptions, because the assumptions bore no relation to accounting principles and thus were beyond his field of expertise.

### Domain Demurs

The trial itself lasted one week, but the District Court invited the parties to file briefs and present final argument at a later date. Pursuant to this request, the parties submitted extensive briefs and, seven months after the trial ended, engaged in one final oral argument. In one of its post-trial briefs, and to a lesser extent in its final oral argument, Domain attacked the accuracy of the damage summaries on a number of points. In addition, Domain argued that the evidence did not support the various critical assumptions upon which the damage summaries were based.

### The Opinion

In its opinion, the District Court answered Domain's contentions in the following fashion:

\* \* \* At the heart of Domain's defense is the contention that no causal link has been established between the breach(s) and the damages that followed therefrom. Or, alternatively, the self-serving testimony which supports a causation finding is offset by countervailing evidence put forth by defendant. In this regard Domain sought to nullify or reduce plaintiff's damage claims by showing:

(1) that NPC was chided by customers for late deliveries before it purchased the machinery at issue;

(2) that plaintiff's production records demonstrate that the two Versa-Fils significantly increased its output when compared with prior fillers and performed as well as, if not better than, the Pfaudler filler presently being used by plaintiff;

(3) that regardless of how the defendant's fillers performed, plaintiff's production line was not capable of running at speeds higher than 40 cpm (quarts) due to the limited capacity levels for both the pasteurizer and the cooling tunnel;

(4) that plaintiff's invoices and pack records, which constitute the raw data from which the lost sales figures were compiled, are in some instances erroneously reflected in the damage exhibits; thus the lost sales calculation is excessively stated or, at the very least, inaccurate;

(5) that at various times while plaintiff used defendant's fillers production time was lost due to defective produce (apple juice concentrate in 1972) or shortage of product (papaya in 1973).

Conceivably Domain has, by virtue of the above, undermined the plaintiff's assertion that some $250,000 of lost profits is solely attributable to the performance of its filling machines. However, item No. 1 above is not here material because the primary reason for buying the Versa-Fil was to increase production capacity (via speedier filling) so that back orders could be filled and future ones timely met. No. 2 is irrelevant because the issue here is whether *defendant's* Versa-Fil machines performed as warranted. Nor does item No. 3 help Domain since there is evidence that the production line could have been made—through minor adjustments—to accommodate 100 cpm had the Versa-Fils functioned as expected.

While there may be some intrinsic merit to No. 4 the Court believes that discrepancies between the raw data and damage summaries are insignificant. First of all Scherwinski stated that a spot check made of the raw data records revealed no inconsistencies. Defendant's accounting expert, Mr. William Ronald Walton, did not attempt to verify the

figures in the damage exhibits against the raw data sheets. Contrary to Domain's thinking it is not this Court's function to audit the business records of plaintiff. We are solely guided by the evidence and there is little, if any, testimony indicating that plaintiff's damage summaries are reasonably uncertain. Moreover, and to reiterate, a margin for error was allowed in the data compilation and computation of the damage figures.

Undoubtedly the final item may have had some effect on the production record of NPC during the years in question. Product shortages and similar business developments are common problems faced by any entrepreneur. Since we find a single instance of papaya shortage and one incident involving defective product, given the overwhelming evidence which supports a finding that the machines not only operated below par but were often broken down, we are disinclined to credit defendant's theories or what comprised the substantial factors in bringing about plaintiff's losses.

### The Critic's Review

■ We have no quarrel with the District Court's answers to the first three objections of Domain, as identified in its opinion. While evidence (a) that NPC had problems with late deliveries prior to the installation of the first Versa-Fil and (b) that NPC's production was not significantly greater with the replacement Pfaudler filler, does suggest that factors other than the substandard performance of Domain's fillers may have been responsible for NPC's business woes, that evidence can be discounted on the hypothesis, amply supported by the evidence, (a) that the pre-1972 delivery problems were caused by the very sort of production equipment inadequacies that NPC had hoped to rectify, but did not, by purchasing a Domain Versa-Fil, and (b) that after NPC had replaced the Large Frame Versa-Fil with the Pfaudler filler, increased production was no longer necessary since NPC had lost so much business in its years operating with the Domain fillers. Nor was the District Court clearly erroneous in crediting Mr. Barnes' testimony that the capacity of the pasteurizer and cooling tunnel could easily have been increased to match the warranted capacity of the Versa-Fils, had they performed as warranted.

■ We cannot, however, uphold the District Court's responses to the last two contentions of Domain which it addressed (items (4) and (5) as denominated by the District Court). Nor can we sustain a conclusion the Court must have reached in order to award NPC its entire claim of $250,772.33 in lost profits damages—that with respect to each and every alleged lost sale, all of the necessary assumptions were sufficiently supported by the evidence. Our difficulties have a common theme: while it is virtually undeniable that the deficient performance of Domain's fillers caused serious production problems for NPC, which in turn caused NPC to lose business and hence profits, many of the individual late or unfilled orders for which the District Court awarded damages cannot on this record be attributed to Domain's fillers with the reasonable certainty required under Florida law for the recovery of lost profits damages.

To be sure, the District Court recognized the possibility that there might be a failure of proof with regard to some of the individual orders concerning which NPC claimed lost sales. But the Court concluded that this possibility did not prevent it from adopting NPC's damage summaries in measuring NPC's total losses, citing basically four reasons: (i) the possible failures of proof were few and insignificant in light of the "overwhelming evidence;" (ii) there was "little, if any, [direct] testimony indicating that plaintiff's damage summaries are reasonably uncertain;" (iii) it is not the Court's "function to audit the business records of plaintiff;" and (iv) a margin of error was built into NPC's method of computing damages.

■ The flaw in this reasoning is that there are substantially more than a few failures of proof (as we discuss shortly), and that Domain was not relying upon the

Court's conducting an audit of NPC's business records to discover all of these failures. Although Domain never disputed—either at or after trial—each and every order itemized in NPC's damage summaries whose proof was suspect, it did, in its post-trial briefs, direct the Court's attention to serious and specific deficiencies in the proof of many of the items. At that point the Court should have realized that it could not accept NPC's damage summaries *in toto* as the measure of lost profits on the ground that any individual failures of proof were too few and insignificant to undermine the reasonable certainty of the aggregate total. It was then incumbent upon the Court either to order a new trial altogether on damages, or, if NPC desired to stick to its damage summaries, to hear additional evidence and argument on the accuracy of the summaries and validity of the underlying assumptions with respect to each and every claimed lost sale which Domain disputed.

### Sam Spade Stumbles: Some Failures Of Proof

■ It is not necessary for us to review all the points raised by Domain in its post-trial briefs. It will suffice instead to mention those more serious deficiencies which undermine the reasonable certainty of the total lost profits damages award and which figure to be relevant to any trial on remand. Virtually all these deficiencies relate to one of three of the critical assumptions upon which the damage summaries were predicated: in each case, the evidence does not warrant the assumption (a) that the delay in filling and shipping the order was caused by Domain's fillers (see assumption [1], *supra*); or (b) that the shipment was a "late delivery" because it was made more than two weeks after the customer had placed the order (see assumption [2], *supra*); or (c) that NPC incurred lost sales equal to the amount by which the order remained unfilled within the requested time period (see assumption [6], *supra*).[10]

(a) Many of the late orders for which NPC claimed, and was awarded, lost profits damages simply cannot be attributed with any degree of reasonable certainty to the substandard performance of Domain's fillers. Some of these orders, for example, while untimely filled and shipped, occurred *before* the scheduled delivery date of the Domain Versa-Fil. NPC's claim of lost sales to Nutritional Foods, Inc. and Bettman Nut Co. in the amount of $97,215 (representing in excess of $20,000 in lost profits) is a case in point. Virtually this entire claim is predicated upon late orders that, according to the evidence *and* the damage summaries themselves, were shipped to Nutritional Foods and Bettman Nut between July 21, 1971 and February 3, 1972. NPC, however, had not even purchased the Versa-Fil until December 1971, and delivery was not scheduled until late February 1972. Thus, NPC's claim that the failures of the Domain fillers caused it to lose business (except perhaps in an almost infinitesimal amount) to Nutritional Foods and Bettman Nut not only strains, but actually defies credibility.

■ The same problem infects NPC's claim of lost sales to Mottel Health Foods. This claim of $108,014.99 in lost sales (over $23,000 in lost profits) is based almost wholly upon eight late shipments between July 21, 1971 and August 4, 1972. Only three of those shipments occurred after the scheduled delivery date of the Domain Versa-Fil. To the extent the District Court awarded NPC damages on the basis of earlier shipments, the Court's award is clearly erroneous.

■ The two claims just discussed are fatally deficient because they are predicated in large part upon production and delivery problems NPC experienced prior to March 1, 1972, the supposed starting date of the damages period. Other claimed lost

10. Domain also challenged the validity of the assumptions pertaining to "out-of-stock condition" (see assumption [3], *supra*), and to the "case movement" method of calculating damages (see assumptions [4] and [5], *supra*). We find, however, that on the basis of the evidence introduced at trial the Court's implicit approval of these assumptions was not clearly erroneous, except perhaps with respect to a few isolated orders.

sales, while at least within the damages period, still cannot be attributed to Domain because they too apparently would have occurred even if the Domain filler had been delivered on time and performed as warranted. For example, NPC needed not only a new filler but also a new pasteurizer in order to increase production on all pasteurized products, including various juices and papaya concentrate. As with the filler, however, the new pasteurizer was not delivered on time, and it was not installed until May 31, 1972. At that time, NPC had outstanding a number of orders from General Nutrition Corp. for juice and papaya concentrate that were supposed to be filled by Oct. 1, 1972. As things developed, NPC was unable to fill these orders completely by Oct. 1. It pro-rated the unfilled portion of these orders by the 7 months between March 1, 1972, and the final delivery date of Oct. 1, 1972, and claimed that Domain was responsible for the lost sales on these orders, as pro-rated, which amounted to $101,810.40 (or some $22,000 in lost profits). But since these products had to be pasteurized before being filled on Domain's filler, and since the new pasteurizer necessary for increased production was not installed until May 31, 1972, it was clearly erroneous to hold Domain liable for NPC's inability to complete a pro-rated portion of these orders prior to May 31, 1972.[11]

The explanation for still other late or unfilled orders appears more likely than not to lie in factors totally unrelated to NPC's production line. The instances of papaya shortage[12] and defective product[13] mentioned by the District Court are among them. In addition, Domain identified several instances in which NPC delayed shipping an already filled order either to take advantage of combined freight rates by shipping it with another order to the same customer or because NPC had run out of the labels that it affixed to the product containers for its customers. With respect to orders such as these, where the evidence strongly suggests that the actual cause of the shipping delay and NPC's claimed lost profits was something other than Domain's substandard fillers, it was error for the District Court to award lost profits damages.

(b) In preparing its damage summaries, NPC assumed that each of its customers expected delivery within two weeks, and that any delivery made more than two weeks after an order was placed constituted a "late delivery."[14] For the most part, the evidence introduced at trial was sufficient to support this assumption: NPC's broker testified that it was standard in the industry for orders to be delivered within two weeks and there was credible testimony from most of NPC's customers that they each expected to receive shipment within two weeks from the time they placed their orders. However, the purchasing agent for Balanced Foods, Inc. testified that he placed his orders when he had "approximately a six- to eight-week supply." And

11. An additional problem concerning NPC's claim of lost profits on these orders from General Nutrition is discussed in the text, *infra*, at footnote 16.

12. A former employee of NPC testified that during the "latter two or three months" of 1973, "we didn't have papaya coming in to supply our people we were packing for." This testimony concerning a papaya shortage in late 1973 was never directly refuted. Yet NPC seeks to hold Domain responsible for the 6,586 cases NPC never filled, and resulting lost sales of $62,567, on an order for papaya concentrate placed on Nov. 5, 1973 with delivery by Dec. 31, 1973.

13. Domain introduced into evidence a letter from NPC's president, Mr. Barnes, to the company that supplied NPC with its apple juice concentrate, in which Barnes complained about the extremely poor quality of the concentrate and stated that in its attempts to pack the defective concentrate as salable merchandise, NPC had lost 11 working days in July and August of 1972. Although the evidentiary value of this letter was never questioned, NPC made no adjustments for those 11 lost working days when it claimed lost sales of $22,852 on the unfilled portion of an apple juice order from General Nutrition Corp.

14. And, according to NPC's case movement calculation (see assumption [4], *supra*), lost sales were in part a function of the number of weeks each shipment was late.

the purchaser for Health Foods, Inc. testified that four to six weeks was the "normal time lag" and that he did not regard a shipment received six weeks after the order was placed to be "an extraordinary delay." With respect to these two customers, then, the evidence did not warrant the assumption that orders received from two to six weeks after placement constituted late deliveries. Yet all but two of the "late deliveries" to these customers for which NPC was awarded lost profits were actually delivered within six weeks of the time they had been placed.

(c) NPC's largest customer, General Nutrition Corp., frequently placed large orders for a particular product, requesting delivery over a fixed period, often one year. NPC was unable to complete a number of these orders within the requested time period, and it claimed lost sales equal to the number of cases by which such orders remained unfilled at the end of the requested time period.[15] The problem with this approach is that in several instances the evidence shows that NPC made additional shipments of the product after the requested delivery date.[16] Whether or not those shipments were applied to the unfilled order is a matter of dispute between the parties. Domain contends that they were, relying on testimony to the effect that an "X" marked on General Nutrition's copy of the purchase order indicated that General Nutrition regarded that order to have been filled. NPC counters with testimony that as a matter of internal convenience General Nutrition would simply apply deliveries to "some order" but not necessarily to the order being filled. Even assuming that NPC's explanation is the correct one, however, we believe that it had the burden of proving—to take one example—that a shipment of 200 cases of cranberry juice on Oct. 2, 1972 was applied to some order other than the order for 1,560 cases of cranberry juice with delivery by Oct. 1, 1972 before it could claim those 200 cases among its lost sales on the 1,560–case order. The shipments may have been late, and NPC may have incurred some lost sales as a consequence, but on the basis of the evidence introduced at trial it is not reasonably certain that additional, albeit late, shipments were not in fact made and that NPC lost sales equal to the amount by which orders were unfilled as of the requested delivery date.

### Play It Again, Sam

The above review of specific failures of proof is not exhaustive. NPC's damage summaries contain yet additional damage claims that, for one reason or another, are

---

15. Again, NPC's approach to damages concerning these orders from General Nutrition differs from the approach it adopted concerning other orders under assumptions [2], [4], and [5]. With respect to the large, extended delivery period orders from General Nutrition, NPC based its damage claim on the amount by which the orders remained unfilled at the end of the requested delivery period; with respect to other orders, NPC calculated its damages according to the number of weeks it was late in making delivery.

16. For example, in 1971 General Nutrition Corp. placed a number of orders for various juices with delivery between Oct. 1, 1971 and Oct. 1, 1972. None of these orders had been completely filled by Oct. 1, 1972, and NPC claimed damages for a pro-rated portion (representing the 7 months between March 1, 1972 and Oct. 1, 1972 when the Domain Versa-Fil should have been producing as warranted) of the unfilled amount. In making this claim, however, NPC ignored numerous shipments after Oct. 1, 1972, which Domain contends—with

some support in the evidence—were applied to the Oct. 1971–Oct. 1972 orders.

With respect to General Nutrition's order of red raspberry juice, NPC claimed lost sales of 517 cases, despite the fact that (as revealed by NPC's shipping invoices) 200 cases were shipped on Oct. 2, 1972, 28 more cases on Oct. 13, and 402 cases on Feb. 6, 1973. With respect to cranberry juice, NPC claimed lost sales of 515 cases, without reference to shipments of 200 cases on Oct. 2, 1972, 103 cases on Oct. 13, 300 cases on Jan. 4, 1973, and 153 cases on Jan. 22, 1973. Similar omissions characterize NPC's claims of lost sales on the orders of black cherry juice (omitting 322 cases shipped between Oct. 2 and Oct. 13, 1973), prune juice (omitting 496 cases shipped between Nov. 29, 1972 and Feb. 9, 1973), concord grape juice (omitting 722 cases shipped between Nov. 29, 1972 and Feb. 6, 1973), and blueberry juice (omitting 277 cases shipped between Jan. 22 and Feb. 6, 1973).

suspect.[17] All told, these individual failures of proof are so numerous—and many of them involve such substantial damage claims—that we are left with the definite and firm conviction that the District Court's award of $250,772.33 in lost profits is erroneous.[18]

■ Although the Court's consequential damages award cannot stand, we decline to reverse with instructions that judgment be entered limited to incidental damages. We have little doubt that NPC's business was directly, seriously, and adversely affected by Domain's breach of its warranties, and it is quite likely that NPC can prove with the requisite degree of legal certainty that Domain's breach caused it to lose some reasonably definite amount of profits. Moreover, had the District Court recognized the fatal flaws in NPC's first attempt to prove lost profits damages—flaws that never really were pointed out to the Court until after trial—we are convinced that the Court, which all along had approved NPC's method of proof, would either have granted NPC a new trial or at least have reopened the proof to permit an appropriate factual evaluation. In these circumstances we believe it only equitable that NPC and Domain be afforded an opportunity to present more fully the case for and against consequential damages.

■ We therefore vacate the consequential damages award and remand that issue for a retrial on the present record as supplemented by either or both parties. If on remand NPC again adopts a method of proof that focuses upon individual late or unfilled orders or requires an analysis of NPC's production records as well as hundreds of invoices and purchase orders, reference to a master would certainly be appropriate.[19]

With respect to Domain's liability under Florida law for breach of express and implied warranties, we affirm the judgment of the District Court. We also affirm the Court's award of incidental damages to NPC in the amount of $4,799.35.

AFFIRMED IN PART; VACATED and REMANDED IN PART.

---

17. For example, in one of its post-trial briefs (Brief of Aug. 6, 1976, pp. 21–22), Domain identified six or seven instances in which the damage summaries incorporated erroneous data; had the correct information been used, NPC's damage claims on those orders would have been nullified or reduced significantly.

18. *See United States v. United States Gypsum Co.*, 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (describing "clearly erroneous" test for appellate review of District Court findings of fact under F.R.Civ.P. 52(a)).

19. F.R.Civ.P. 53(b) expressly states that nonjury actions involving a "difficult computation of damages" are among those exceptional cases in which reference to a master is appropriate.