**B. Anders NYQUIST and Harriet Nyquist, Plaintiffs-Appellees,**

v.

**Dale RANDALL, Defendant-Appellant,**

**Donald Berry, Janet Melear, etc., et al., Defendants.**

No. 86–3510.

United States Court of Appeals, Eleventh Circuit.

June 19, 1987.

Daniel S. Dearing, Dearing & Smith, Tallahassee, Fla., for defendant-appellant.

Robert L. Hinkle, Tallahassee, Fla., for plaintiffs-appellees.

Before GODBOLD and HILL, Circuit Judges, and ESCHBACH *, Senior Circuit Judge.

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. The dairy was owned and operated by Mr. Melear along with various members of his family. During the pendency of this suit in state court, Mr. Melear died and his wife was substituted as personal representative for him. For the sake of simplicity, we will refer to all members of the Melear family, as well as the Melear Dairy collectively as "Melear."

2. The term "heifer" refers to female cattle that have not yet given birth. Once a female has "calved," i.e., has given birth to a calf, she becomes a "cow." Thus, as the defendants pointed out in the court below, the term "first-calf heifer" is something of a redundancy because there is no such thing as a "second-calf heifer." However it is not redundant in the sense that it indicates that the heifer is, indeed, with calf. Heifers are frequently sold, as they were in this case, while they are pregnant with their first calf. Shortly after their delivery (here the testimony was that the period was supposed to be 30–40 days), the heifers give birth and, as do

ESCHBACH, Senior Circuit Judge:

This diversity case arises out of a transaction in which a Wisconsin dairy ranch sold dairy cattle to Florida investors for lease to a Florida dairy farmer. The deal, for want of a better term, went sour. From a verdict for the investor plaintiffs, the defendant seller appeals, contending that the trial court's failure to give a jury instruction regarding "cover" was error, and that the instructions on the breach of warranty claim were in error because they did not require plaintiff to prove "substantial" non-conformity of the cattle to the agreement as a prerequisite to recovery. We find no reversible error and therefore affirm.

I

In April or May of 1983, W.T. Melear,[1] owner of a dairy farm in Monticello, Florida, purchased approximately seventy dairy cattle from the defendant, Dale Randall. Melear had flown to Randall's dairy cattle ranch in Wisconsin and selected the cattle. The herd included both "heifers" and "cows." [2] The cattle worked out well for Melear, and he indicated a willingness to deal with Randall in the future.

most mammals, begin to lactate. This event is referred to as "freshening" whether the animal is a heifer-recently-turned-cow or a cow that has had a second or subsequent calf. When cattle "freshen" they are immediately put into dairy production to avoid any disruption of their lactation. Although denying additional guarantees, the defendants admitted that they guaranteed that the cattle would have four good "quarters" when they "freshened." The term "quarters" apparently refers to the four teats on a cow's (or heifer's) udder.

Throughout this opinion, we will endeavor to use precise terminology, using the term "cow" only to refer to animals that have previously given birth and the more general term "cattle", (which presents another problem, as it could be understood to refer to bulls as well), to include both cows and heifers. We hope however that the reader will pardon any lapse into the layman's usage of the term "cow" to denote any female cattle. Such lapses have occurred throughout this case on the part of judges, lawyers, and sometimes even the parties.

In early October, 1983, Randall's agents, Donald Berry and Buddy Mercer,[3] approached Melear in an attempt to sell more cattle. Although Melear was interested, he did not have the funds to purchase additional cattle at that time. Accordingly, a deal was worked out whereby a third party would purchase the cattle and lease them to Melear. Berry contracted Anders and Harriet Nyquist,[4] the plaintiffs in this case, to see if they would be interested in purchasing and leasing the cattle. A deal was arranged shortly thereafter.

Pursuant to the terms of the agreement, the plaintiffs purchased 80 head of cattle, represented by Randall (through Berry) to be "first calf heifers" two to three years of age. The purchase price of the cattle was $1000 per head. The plaintiffs in turn leased the cattle to Melear for $35 per head per month, for a total of $2800 per month, with a lease term of five years. At the end of the five-year term, Melear had an option to purchase the 80 cattle for $16,000. The cattle arrived at the Melear dairy farm in the evening on October 15, 1983 (a Saturday). The closing of the sale transaction and the execution of the lease took place simultaneously on the following Monday, October 17, 1983. Copies of interstate health certificates, which bore, among other things, the ages and vaccination dates of the individual animals, accompanied the bill of sale. The lease contained a clause whereby Melear acknowledged that he had examined the herd and that in his expert opinion it had at least 10 years of "useful, economic productive life remaining as a Holstein Dairy Herd."

Shipment of cattle, however, leaves them in a stressed, dehydrated state, and little can be ascertained about their condition for several days after their arrival. In early November, as the cattle started to "freshen" it became apparent that some of the cattle were older than they had been represented and were "cows" rather than "heifers." [5] That is, they had calved before. Before the due date of the first lease payment, November 20, Melear had a veterinarian come and "mouth" [6] the cattle to determine their approximate age. The veterinarian discovered that about half of the cattle were older than represented, and, Melear refused to make the lease payment.

After the parties were unable to resolve their differences, the Nyquists brought suit in state court against Melear, for breach of the lease, and Berry, for breach of the sales contract. Randall was later added as a defendant on the latter claim. After the veterinarian plaintiffs retained to "mouth" the cattle came to substantially the same conclusion that Melear's veterinarian had reached, i.e., that the cattle were substantially older than represented, a settlement was reached with Melear. Under the settlement, Melear entered a revised lease calling for lower payments. Melear was dismissed from the suit, leaving complete diversity of citizenship between the parties. Randall and Berry removed the case to the United States District Court for the Northern District of Florida under 28 U.S.C. §§ 1441(a), 1332 and 1446(b) (1982).

At trial, plaintiffs sought the difference, including lost interest at a rate of 12%, in the economic value of the original and revised leases. Plaintiffs' economic expert testified that that difference was $62,902.96.[7] Defendants contended that this

---

**3.** Mercer's relationship to Randall or Berry is not clear from the record. It appears that he was a local broker who put potential cattle buyers in touch with potential sellers.

**4.** Harriet Nyquist was Anders Nyquist's mother. He acted as her agent, under a power of attorney, in all aspects of the transaction.

**5.** *See* note 2, *supra.*

**6.** "Mouthing" cattle is, as the name implies, a process involving inspection of the mouths of the animals. The permanent incisor teeth of cattle erupt at predictable ages, allowing a com-

petent veterinarian to estimate the age of any particular animal within six months. The process is less accurate in cattle over five years of age because they have by then a full complement of teeth, and age can only be estimated by examining the wear on the teeth, which can vary widely according to the diet of the cattle.

**7.** Defendants attempted to discredit plaintiffs' economic analysis by pointing out that they had not actually valued either of the leases by discounting the stream of payments, but rather merely calculated the difference of the payments and then applied an appropriate interest

loss constituted "consequential damages" and thus was not recoverable in the absence of "cover." *See* Fla.Stat.Ann. § 672.715(2)(a) (West 1966). Additionally, defendants complained that the jury instructions and verdict form were erroneous because they allowed the plaintiffs to recover for "any" non-conformity of the cattle to the agreement rather than "substantial" non-conformity. The district court adopted plaintiffs' contentions that the damages resulting from the decreased lease payments were "direct" damages recoverable under Fla.Stat.Ann. § 672.714(1) and denied defendant's request for an instruction regarding cover. Additionally, it agreed that the instruction regarding "any" non-conformity was appropriate. The jury awarded plaintiffs a verdict of $62,000.[8]

## II

We first consider Randall's contention that damages measured by "lost profits," such as those in the instant case, are "consequential damages" calling the "cover" provision of Fla.Stat.Ann. § 672.715(2)(a).[9] into effect. We conclude that such damages are "consequential" and thus trigger the obligation on the part of the plaintiffs to cover or otherwise mitigate their losses as a prerequisite to recovery. However, under the circumstances of this case, the buyers fulfilled that obligation and thus were not precluded from recovering their lost profits.

## A

Plaintiffs strenuously contended, both in the district court and before this court, that the damages they sought were properly recoverable under Fla.Stat.Ann. § 672.714(1)[10], and thus they were not required by § 672.715(2)(a) to "cover." However, § 672.714 gives a remedy for "damages for any non-conformity of tender the loss resulting *in the ordinary course of events* from the seller's breach...." The section plainly applies to so called "direct" damages. The "ordinary course of events" does not include special leasing arrangements or other contracts at a premium that the buyer may have.

"Lost profits" are typically considered to be "consequential damages." R. White & J. Summers, *Handbook of the Uniform Commercial Code*, § 10–4 at 391 (2d ed. 1984). Cases applying Florida law seem to have assumed this to be the case, without discussing the issue. *See National Papaya v. Domain Industries, Inc.*, 592 F.2d 813 (5th Cir.1979); *Council Bros., Inc. v. Ray Burner Co.*, 473 F.2d 400 (5th Cir. 1973); *Miles v. Kavanaugh*, 350 So.2d 1090 (Fla.App. 3d Dist.1977). In fact, lost profits may indeed be the quintessential example of "consequential damages." *See Hadley v. Baxendale*, 156 Eng.Rep. 145 (Exch. 1854). In that case, which is generally regarded as the foundation of the modern law of consequential damages, the court denied recovery for lost profits occasioned

---

rate. However, the defendants did not perform their own economic analysis of plaintiffs' damages from the reduced lease payments, apparently because it was their position that such damages were not recoverable. The jury apparently accepted the testimony of plaintiffs' expert as to the economic loss.

**8.** Berry was absolved from liability because the jury found that he disclosed that he was acting as an agent for Randall.

**9.** Section 672.715(2) provides, in pertinent part:
Consequential damages resulting from the seller's breach include:
(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise;
* * *

**10.** Section 672.714(1) provides:
Where the buyer has accepted goods and given notification (§ 672.607(3)) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
Although we agree with the defendants that the lost profits in this case are consequential damages, we reject as wholly without merit the argument that § 672.714(1) is inapplicable to breaches of warranty such as the present case, merely because there is a separate "general rule" stated for such cases in § 672.714(2). *See* U.C.C. § 2–714, Official Comment 2 (1962).

when a mill was forced to shut down by the delay in delivering an essential part for it. In denying recovery, the court stated that the loss "would not have flowed naturally from the breach of this contract in the great multitude of such cases occurring under ordinary circumstances...." *Id.* at 151.

Such damages are properly covered by section 672.715, which states that "consequential damages ... include: (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." While the statute could certainly have been drafted more carefully, it clearly was intended to mean that (1) "consequential damages" are those damages "resulting from general or particular needs" of the purchaser, (2) such damages are not recoverable unless "the seller at the time of contracting had reason to know" of the possibility that they would occur, and (3) such damages are not recoverable unless they "could not reasonably be prevented by cover or otherwise." The official comment to the Uniform Commercial Code section from which the Florida statute was drawn makes plain the intended import of language used:

> Subsection (2) operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach. The "tacit agreement" test for the recovery of consequential damages is rejected. Although the older rule at common law which made the seller liable for all consequential damages of which he had "reason to know" in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise.

U.C.C. § 2–715, Official Comment 2 (1962).[11]

The district court relied, as do plaintiffs in this court, on the fact that defendant

knew from the beginning that the transaction was three sided—that the only purpose for which the Nyquists purchased the cattle was for lease to Melear. However, this is not a ground for holding, as the district court did, that the damages were not governed by § 672.715. It is instead a factor specifically made relevant by that section in determining whether consequential damages are recoverable in a particular case.

Plaintiffs seem to argue that, even if the damages here sought fall within the definition of consequential damages under § 672.715, they are also recoverable under § 672.714, because that section authorizes recovery of "damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." Because the defendants knew this was a "sale-lease" transaction, plaintiffs argue, calculation of damages based on the different values of the leases is "reasonable," and since the remedy provisions of the Code are not mutually exclusive they are entitled to recover their damages under § 672.714. As we have already pointed out, the reduced lease payments simply are not "loss resulting in the ordinary course of events." Additionally, plaintiffs' broad interpretation of § 672.714 would render the cover obligation in § 672.-715 nugatory. Therefore we hold that the loss of the value of the first lease constituted "consequential damages."

## B

■ However, the district court's misapprehension of the law does not require reversal in this case. Although Randall strenuously argues that the evidence shows that the Nyquists did not attempt to effect cover (meaning that they did not attempt to procure more cattle to lease to Melear to replace the defective ones), it also shows that the reason they did not do so was that they did not have the wherewithal to purchase additional cattle. Mr.

---

11. Thus, although its literal language may seem to suggest that the failure to cover or the lack of knowledge (or reason to know) exclude particular items from the definition of consequential

damages, leaving the possibility that they might be recoverable as "direct" damages, the sense of the section precludes such a result.

Nyquist testified, without contradiction, that "At that time after we had paid for the cows I didn't have the cash to purchase any more cows." Record, Vol. 4 at 101.

Fla.Stat.Ann. § 672.715 precludes recovery of consequential damages only where the loss could *"reasonably* be prevented by cover or otherwise." (emphasis added). Where the buyer is prevented from covering because of his financial condition, which is attributable in part to the seller's breach, we do not believe it is reasonable to require him to perform the impossible. *See Gerwin v. Southeastern California Association of Seventh Day Adventists,* 14 Cal. App.3d 209, 92 Cal.Rptr. 111, 8 U.C.C. 643 (1971) (buyer's failure to cover did not preclude consequential damages where his financial condition prevented him from purchasing a substitute item).

Additionally, plaintiffs did attempt to mitigate their loss by entering a revised lease with Melear. Section 672.715 specifically refers to losses that could not be avoided "by cover *or otherwise."* (emphasis added). While Randall is quite correct that "cover" is a very specific term and refers to the purchase of substitute goods, *see* § 672.712, that is not the only mitigating option available to a disappointed buyer who wants to preserve his right to consequential damages. *See Waters v. Massey-Ferguson, Inc.,* 775 F.2d 587 (4th Cir.1985)

(buyer of defective tractor hired area farmers to plant his fields); *Chatlos Systems, Inc. v. National Cash Register Corp.,* 479 F.Supp. 738 (D.N.J.1979) (continued use of defective goods), *aff'd in part, remanded in part on other grounds,* 635 F.2d 1081 (3d Cir.1980) (upholding contractual exclusion of consequential damages), *appeal after remand,* 670 F.2d 1304, *cert. dismissed,* 457 U.S. 1112, 102 S.Ct. 2918, 73 L.Ed.2d 1323 (1982); *Prutch v. Ford Motor Co.,* 618 P.2d 657 (Colo.1980) (continued use of defective goods). There is no evidence in the record from which a jury could have concluded that plaintiffs' renegotiation of the lease was unreasonable. In fact, it appears to have been the only reasonable course available to them since they had no money with which to buy additional cattle and no place to keep the defective cattle, which Melear was threatening to put off his property. Thus we hold that the district court's failure to give an instruction to the effect that unless the plaintiffs "covered" they could not recover their damages was not reversible error.[12]

### III

Finally, we come to Randall's argument that the jury should have been instructed that there must have been a "substantial" non-conformity for the plaintiffs to be entitled to any recovery.[13] That argument

---

12. Our view of the case makes it unnecessary for us to decide whether defendants' tendered instruction misallocated the burden of proof and could thus be properly refused. We note, however, that there is a split of authority regarding the burden of proof on "cover." *Compare Hardwick v. Dravo Equipment Co.,* 279 Or. 619, 569 P.2d 588, 591 (1977) (burden is on seller) with *International Petroleum Services, Inc. v. S & N Well Service, Inc.,* 230 Kan. 452, 639 P.2d 29 (1982) (burden is on buyer). We do note that in ordinary contract cases in Florida, failure to mitigate must be specifically pled. *Opler v. Wynne,* 402 So.2d 1309, 1312 & n. 2 (Fla.App. 3d Dist.1981). Some courts have extended such rules to U.C.C. cases. *See TCP Industries, Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 550 (6th Cir.1981). However, we need not decide whether Florida would do so.

Additionally, we do not rely on plaintiffs' argument that defendants waived the cover issue by not pleading it or including it in their list of issues in the pretrial stipulation. The pretrial stipulation does refer, however fleetingly, to

cover, and plaintiffs' counsel indicated an awareness that cover was an issue during his opening statement at trial. Additionally, the district court treated the issue as having been properly preserved.

13. In the briefs, this argument was not delineated very clearly, with defendant's statement of the issue appearing to challenge the sufficiency of plaintiffs' evidence to go to the jury. However, at oral argument, defendant made clear that his objection was to the instructions under which the case was submitted to the jury, and it is clear from the transcript that this was the issue presented to the trial court. Accordingly, we consider defendant's asserted point as being a defect in the instructions. In the event that defendant also intends to challenge the sufficiency of plaintiffs' case to go to the jury, we reject that challenge. There was testimony that the jury was entitled to credit that representations were made as to the age of the cows, and their non-conformity to that representation. No more was required.

need not detain us long. Section 672.714 expressly provides that a buyer who has accepted goods "may recover as damages for *any non-conformity* of tender...." (emphasis added). The district court's instructions correctly stated the law in this regard.

 Defendant's argument seems to be based on Fla.Stat.Ann. § 672.608, which provides under certain circumstances that "[t]he buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him." [14] However, plaintiffs in this action did not seek to "revoke" their acceptance of the cattle. Rather, they sought damages for non-conformity as provided in §§ 672.714 and 672.715. Thus, the section on revocation of acceptance, even if it required a substantial non-conformity,[15] is simply inapplicable to this case. In this regard, § 672.607, which relates to rejection of tendered goods (which, although permissible in broader circumstances than revocation of acceptance, is similar in effect to revocation) is relevant and provides that "... acceptance does not of itself impair any other remedy provided by this Article for non-conformity." Thus it is clear that the sections relating to rejection and revocation of acceptance do not limit a buyer's right to sue for damages for breach of contract, by requiring a greater non-conformity or otherwise.

## IV

For the reasons stated above, the judgment of the district court is

AFFIRMED.

14. We are somewhat at a loss to understand defendant's "commercial unit" argument. Even were it relevant, we are doubtful that an individual animal is not sufficiently distinct to constitute a commercial unit given that the definition of commercial unit is "such a unit of goods as by commercial usage is a single whole for purposes of sale *and division of which materially impairs its character or value on the market or in use*." Fla.Stat.Ann. § 672.105 (emphasis added).

15. The section only refers to "non-conformity which substantially impairs" the value to the purchaser. We note that the district court's instructions did require a non-conformity which "substantially impaired" the value of the cattle to the Nyquists. This instruction was certainly as favorable as the defendants were entitled to. We express no opinion whether plaintiffs could have objected to that instruction.