470 So.2d 60 (1985)
R.A. JONES & SONS, INC., a Florida Corporation, Appellant,
v.
John HOLMAN, Ralph A. Moody, Jr. and Donald E. Wade, As Trustees of Holman & Moody, Inc., a Dissolved North Carolina Corporation, and Ford Motor Company, a Delaware Corporation, Appellees.
FORD MOTOR COMPANY, a Delaware Corporation, Appellant,
v.
R.A. JONES & SONS, INC., a Florida Corporation, Appellee.
Nos. 82-2372, 83-16 and 83-63.
District Court of Appeal of Florida, Third District.
June 4, 1985.
*62 Magill, Reid & Lewis and R. Fred Lewis, Finley, Kumble, Wagner, Heine & Underberg, Miami, for appellant in Case Nos. 82-2372 and 83-16; for appellee in Case No. 83-63.
Blackwell, Walker, Gray, Powers, Hoehl & Flick and James E. Tribble and Todd A. Cowart, Miami, for appellee Ford Motor Co. in Case Nos. 82-2372 and 83-16; for appellant Ford Motor Co. in Case No. 83-63.
Before BARKDULL and DANIEL S. PEARSON and JORGENSON, JJ.
DANIEL S. PEARSON, Judge.
Appellant R.A. Jones & Sons, Inc. (Jones), a designer and seller of irrigation systems for farm use, bought twenty-three industrial engines manufactured by Ford Motor Company (Ford) from Holman & Moody, Inc. (H & M), the local Ford distributor. Before purchasing the engines, Jones obtained from H & M a Ford publication describing the capabilities of its various engines. Jones inquired of H & M *63 whether the published information was accurate and asked H & M's advice as to which model would be suitable for the kinds of irrigation systems Jones had planned. The engines purchased by Jones from H & M were, as an integral part of Jones' irrigation system, ultimately sold to farmers and placed into operation during the 1975-76 growing season.[1]
By October or November 1975, Jones became aware that most of the engines sold to the farmers were encountering mechanical difficulties.[2] Jones attempted to perform minor repairs in the fields to keep the engines running and contacted H & M, which, unable to correct the problems, contacted Ford. In January 1976, Ford began an investigation[3] and authorized H & M to repair the engines. H & M rebuilt the engines after the 1975-76 growing season and returned them to the farmers for use during the next growing season. The engine rebuilding program was unsuccessful; the engines were still malfunctioning during the 1976-77 growing season.
On June 14, 1978, Jones sued Ford and H & M for breach of warranty of merchantability and breach of implied warranty of fitness for a particular purpose, adding against Ford a claim for breach of express warranty. Jones sought damages for expenses incurred in the repair and maintenance of the engines, for loss of profits from cancelled contracts, and for loss of profits due to loss of prospective customers.
On December 31, 1979, after receiving an assignment of the farmers' rights and actions against Ford and H & M, Jones filed a motion to amend its complaint to add the assigned claims.[4] The trial court permitted the amendment by order dated February 15, 1980, specifying that the amended complaint was to be considered filed as of that date. The amended complaint alleged the same theories of liability against Ford and H & M and added claims for specific elements of damages which had been assigned to Jones by the farmers: (1) expenses incurred in the purchase, repair and maintenance of the engines; (2) loss of crops; (3) loss of profits; and (4) expenses related to the irrigation system for which the engines had been purchased.
The defendants moved to dismiss and for summary judgment. They contended, inter alia, that the assigned farmers' claims were in whole or in part barred by the statute of limitations because the farmers had discovered defects in the engines by December 1975-January 1976, but had not filed suit until February 15, 1980, when the court granted Jones, as assignee of these claims, leave to file the amended complaint. The motions were denied, and the case proceeded to jury trial.
A directed verdict was entered in favor of H & M at the close of the evidence and final judgment entered thereon. On Jones' claims against Ford, the jury found that the engines were defective, held Jones eighty per cent responsible and Ford twenty per cent responsible[5], and assessed the total amount of damages sustained by Jones at $1,300,000. Accordingly, the trial court entered final judgment in favor of Jones for $260,000, but, in post-trial proceedings, granted Ford's request for a remittitur, *64 leaving Jones with an award of $130,000 or, alternatively, a new trial.
By this appeal, Jones seeks review of the directed verdict entered in favor of H & M and the order granting the remittitur or, in the alternative, a new trial. Ford appeals the final judgment which determined Ford's liability to Jones in the amount of $260,000, reduced by the remittitur to $130,000. We conclude that (1) the trial court improperly directed a verdict in favor of H & M; (2) only three of the nine assigned farmers' claims  the claims of Iori Farms, Inc., International Botanicals, Inc., and Pine Island Farms Enterprises  were not limitations-barred, and thus evidence relating to the other six assigned claims was improperly considered by the jury in calculating the amount of Jones' damages; and (3) there is no record support for the remittitur. We reverse for a new trial against H & M and a new trial on damages only against Ford.

I.
We first address the impropriety of the directed verdict in favor of H & M on Jones' claim against H & M for breach of implied warranty of merchantability. Section 672.314, Florida Statutes (1975), provides that in a contract for the sale of goods where the seller is a merchant with respect to goods of that kind, there is an implied warranty that such goods shall be merchantable, as that term is defined in succeeding portions of the section.[6]See Smith v. Burdines, Inc., 144 Fla. 500, 198 So. 223 (1940); Perry v. Luby Chevrolet, Inc., 446 So.2d 1150 (Fla. 3d DCA 1984). Clearly, H & M, as the seller of the engines to Jones and the distributor of Ford industrial engines, is both a "seller," see § 672.103(d), Fla. Stat. (1975), and a "merchant," see § 672.104(1), Fla. Stat. (1975), under Section 672.314. The only remaining question, namely, whether the engines sold by H & M to Jones were merchantable, was resolved in favor of H & M by the trial court's directed verdict. Jones contends that in this case, this question was one for the jury to determine. We agree.
The long-standing caveat which controls here is that:
"[T]he court should never direct a verdict for one party unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law. Where there is room for a difference of opinion between reasonable men as to the proof or facts from which an ultimate fact is sought to be established, or where there is room for such differences as to the inferences which might be drawn from conceded facts, the court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail, and not primarily the views of the judge."

Smith v. Burdines, Inc., 198 So. at 229 (quoting Gravette v. Turner, 77 Fla. 311, 315, 81 So. 476, 477 (1919)).
The evidence presented by Ford showed that the engines were overworked, improperly maintained, and too small to power the irrigation systems designed by Jones. On the other side, Jones' employees *65 and customers, as well as independent mechanics, testified that the piston rings were not seating properly, and the compression was not being held in the engine, resulting in "blow-by" of oil and oil loss. H & M's service manager admitted that the problems with all of the engines were lack of power and "blow-by." Thus, there is substantial, albeit conflicting, testimony from which a jury could find that the engines were not merchantable, and it was error for the trial court to determine on motion for directed verdict the credibility and probative value of such conflicting testimony. See Smith v. Burdines, Inc., 198 So. 223.
Likewise, we find that the trial court erred in directing a verdict in favor of H & M on Jones' claim of breach of implied warranty of fitness for a particular purpose[7] where the evidence adduced at trial created a jury question of whether Jones relied upon its own judgment at the time of the purchase, or the skill or judgment of H & M, the seller. See Smith v. Burdines, Inc., 198 So. 223. Specifically, it will be for the jury to resolve whether, as H & M contends, Jones' purchase of the engines was made in reliance upon literature of the Carter Pump Company, which recommended use of the Ford engine in conjunction with its pump, or whether, as Jones contends, Jones was persuaded by the assurances of H & M with respect to the reliability of the information published by Ford. Compare Halpryn v. Highland Insurance Co., 426 So.2d 1050 (Fla. 3d DCA 1983).
Accordingly, we reverse the directed verdict entered in favor of H & M and remand for trial on Jones' claims for breach of implied warranties of fitness and merchantability. Trial shall be confined to the allegations relating to losses incurred by Jones and by Iori Farms, Inc., Pine Island Farms Enterprises, and International Botanicals, Inc., because, as we have noted and as will be seen infra, the other six farmers' claims, assigned to Jones, were barred by the statute of limitations.

II.

A.
We turn now to Jones' claims against Ford. It is undisputed that, at the latest, Jones knew of the defects in the engines in January 1976.[8] Because a party has four years to bring an action based upon warranty, see § 95.11(3)(k), Fla. Stat. (1975), the suit brought by Jones in 1978 was timely. Jones' original complaint, however, sought damages only for its loss of profits from cancelled contracts, its expenses incurred in the repair and maintenance of the engines, and its loss of profits due to lost prospective customers. It was not until Jones filed its amended complaint that it sought damages for the claims assigned to it by the farmers.
For limitations purposes, an action as to any additional parties or claims is not commenced until the amended complaint is filed. See Owens v. Florida Patient's Compensation Fund, 428 So.2d 708 (Fla. 1st DCA) rev. denied, 436 So.2d 100 (Fla. 1983). In Smith v. Metropolitan Dade County, 338 So.2d 878 (Fla. 3d DCA 1976), this court held that to determine whether the statute of limitations has run, the amended complaint shall be considered filed at the time of filing the motion for leave to amend.[9]See Rademaker v. E.D. *66 Flynn Export Co., 17 F.2d 15 (5th Cir.1927). Therefore, under Smith, Jones' amended complaint would be deemed filed on December 31, 1979, the date upon which Jones filed its motion for leave to amend to reflect the assignment of the farmers' rights and to assert the farmers' claims for damages,[10] notwithstanding the recitation in the trial court's order that the amendment was to be considered filed as of the date of the order, February 15, 1980. The claims of farmers who did not discover or have reason to discover the existence of the defect in the engines constituting a breach of warranty before December 31, 1975, are therefore not limitations-barred.[11]See Creviston v. General Motors Corp., 225 So.2d 331 (Fla. 1969); Kelly Tractor Co. v. Gurgiolo, 369 So.2d 992 (Fla. 3d DCA 1979). Cf. Smith v. Continental Insurance Co., 326 So.2d 189 (Fla. 2d DCA 1976) (in action based on breach of implied warranty, statute of limitations starts running from time buyer first discovers or reasonably should discover defect and not from date of purchase). Only three of the nine assignor-farmers  Iori Farms, Inc., Pine Island Farms Enterprises, and International Botanicals, Inc.  fall into this category.[12] Since the remaining six farmers' claims (and Iori Farms' claim relating to its purchase of two engines in August and September 1975) were discovered before December 31, 1975, they are limitations-barred, unless it can be said that these claims relate back to the original complaint filed by Jones in 1978.

B.
Florida Rule of Civil Procedure 1.190(c) provides that:
"When the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment shall relate back to the date of the original pleading."
The comment appended to this rule when amended in 1966 calls for a liberal application of the principle of relation back of amended pleadings.[13] However,

*67 "Notwithstanding this apparent liberality of approach, the rule is generally stated to be that relation back will not apply to an amendment that substitutes or adds a new party for those named initially in the earlier timely pleadings. E.g., Longbottom v. Swaby, 5 Cir., 1968, 397 F.2d 45. The reasoning apparently is that such an addition amounts to the assertion of a `new cause of action,' and if an amendment were allowed to relate back in that situation, the purpose of the statute of limitations would be defeated. 3 Moore, Federal Practice ¶ 15.15 [4.-1], and cases cited therein."

Williams v. United States, 405 F.2d 234, 237 (5th Cir.1968).
See Johnson v. Taylor Rental Center, Inc., 458 So.2d 845 (Fla. 2d DCA 1984) (relation back rule inapplicable where effect is to bring new parties into suit); Louis v. South Broward Hospital District, 353 So.2d 562 (Fla. 4th DCA 1977) dismissed, 359 So.2d 1217 (Fla. 1978) (same).
However, addition of a party is permitted if it can be said that the new and former parties have an identity of interest so as not to prejudice the opponent by the addition. Williams v. United States, 405 F.2d 234.[14] Critical to this inquiry is the question of notice.
"In determining whether the adversary has had fair notice, the usual emphasis of `conduct, transaction or occurrence' is on the operational facts which give rise to a claim by the particular party based on any one or all of the theories conjured up, whether timely or belatedly. But when it comes to a late effort to introduce a new party, something else is added. Not only must the adversary have had notice about the operational facts, but it must have had fair notice that a legal claim existed in and was in effect being asserted by, the party belatedly brought in. This becomes of special importance in situations in which a common set of operational facts gives rise to distinct claims (or defenses) among distinct claimants (or defendants)."

Williams v. United States, 405 F.2d at 238 (emphasis supplied).
See Leachman v. Beech Aircraft Corp., 694 F.2d 1301 (D.C. Cir.1983); Osborne Enterprises, Inc. v. City of Chattanooga, 561 S.W.2d 160 (Tenn. Ct. App. 1977). Requiring *68 more than mere notice of the operational facts when there is a late-filing newcomer safeguards against "total strangers with claims arising out of a multi-victim incident ... join[ing] pending actions long after the statute of limitations [has] lapsed." Leachman v. Beech Aircraft Corp., 694 F.2d at 1309. Otherwise,
"tardy plaintiffs ... [would] benefit from the diligence of the other victims and, more importantly, could cause defendants' liability to increase geometrically and their defensive strategy to become far more complex long after the statute of limitations had run. Even if, ... there were no showing of specific prejudice in the sense of lost or destroyed evidence, defendants would still be deprived of their interest in repose. At some point, defendants should have notice of who their adversaries are." Leachman v. Beech Aircraft Corp., 694 F.2d at 1309.
The "more" that is required  that there be an identity of interest  "ensures that the old and new plaintiffs are sufficiently related so that the new plaintiff was in effect `involved in [the proceedings] unofficially from an early stage.' The touchstone once again is whether the defendant knew or should have known of the existence and involvement of the new plaintiff." Leachman v. Beech Aircraft Corp., 694 F.2d at 1309 (quoting 3 J. Moore, Moore's Federal Practice ¶ 15.15[4.-1], at 15-220 (1982)). Compare Williams v. United States, 405 F.2d 234, 239 (5th Cir.1968) (where mother of boy injured by Army firecracker sued United States under Federal Tort Claim Act as next friend and sought to amend complaint to appear as plaintiff in her own right, seeking recovery for loss of services after statute of limitations had run, court permitted amendment upon holding that operational facts were fully stated in original complaint, complaint revealed existence of minor, mother as a parent, and assertion by her of a claim, and government had notice that mother's claim involved because "circumstances of these individuals was such as would reasonably indicate a likelihood that a parent would incur losses of a recoverable kind.")[15],[16]; Snoqualmie Tribe of Indians ex rel. Skykomish Tribe of Indians v. United States, 178 Ct.Cl. 570, 372 F.2d 951 (1967) (where Snoqualmie Tribe was prosecuting action against United States based on inequity in treaty with various tribes and sought amendment of complaint to include representative claim on behalf of another tribe, court permitted relation back, holding that government could be charged with notice that Snoqualmies might expand scope of its claim through its authority as administrator of Indian Affairs)[17]; Osborne Enterprises, Inc. v. City of Chattanooga, 561 S.W.2d 160 (Tenn. Ct. App. 1977) (where complaint was amended to include plaintiff's wholly-owned subsidiary, which was in fact the record titleholder of land which was subject of suit and sufficiently described in *69 original complaint, relation back permitted), with Leachman v. Beech Aircraft Corp., 694 F.2d 1301 (D.C. Cir.1983) (corporation wholly owned by existing plaintiff could not be added to action after statute of limitations had run where defendant had no notice of potential involvement of corporation, and there was no relation between plaintiff's claim and her ownership of the corporation's stock); Johnson v. Taylor Rental Center, Inc., 458 So.2d 845 (Fla. 2d DCA 1984) (fact that rental equipment franchisee issued receipt to customers in name of franchisor insufficient to provide basis for customers, who originally sued franchisor, to add franchisee as new party defendant subsequent to running of statute of limitations).
Thus, while the farmers' claims are part of the same operational facts which gave rise to Jones' cause of action and of which Ford was aware, the relation between Jones and its customer-farmers was not such an identity of interest as to give Ford fair notice that a legal claim existed and was in effect being asserted by Jones on behalf of the farmers when Jones brought its original complaint. The amended claims simply state a new cause of action brought by essentially unrelated victims and are thus limitations-barred.

C.
The evidence adduced at trial in support of losses unrelated to any assigned farmer claims showed that Jones sustained damages of, at most, $131,221: $21,762 for direct payroll costs for employees whose time was required in attempting to alleviate the problems with the irrigation systems, $2,016 for repairs, and $107,443 in gross profits lost when two farm organizations which had previously done business with Jones purchased irrigation systems from another supplier.[18] Ford contends that this latter claim for lost profits to be derived from the sale of these two irrigation systems is speculative and therefore not a proper consideration in awarding damages. We do not agree.
While the general rule is that anticipated profits of a commercial business are too speculative and dependent upon changing circumstances to warrant a judgment for their loss, New Amsterdam Casualty Co. v. Utility Battery Mfg. Co., 122 Fla. 718, 166 So. 856 (1935), the law recognizes an exception when such loss of profits of an established business[19] is shown to a reasonable certainty by competent proof. New Amsterdam Casualty Co. v. Utility Battery Mfg. Co., 166 So. 856; Wash-Bowl, Inc. v. Wroton, 432 So.2d 766 (Fla. 2d DCA 1983); Florida Outdoor, Inc. v. Stewart, 318 So.2d 414 (Fla. 2d DCA 1975), cert. denied, 333 So.2d 465 (Fla. 1976); Conner v. Atlas Aircraft Corp, 310 So.2d 352 (Fla. 3d DCA), cert. denied, 322 So.2d 913 (Fla. 1975).
"The standard for the degree of certainty requires that the mind of a prudent impartial person be satisfied with the damages. If the proximate estimates of witnesses lead to a satisfying conclusion, *70 damages may be awarded accordingly. However, uncertainty as to the amount of damages or difficulty in proving the damages will not prevent recovery if it is clear that substantial damages were suffered as a result of the wrong.[[20]] Inability to give the exact or precise amount of damages does not preclude recovery so long as there is a reasonable basis in the evidence for the amount awarded."

Conner v. Atlas Aircraft Corp., 310 So.2d at 354.
See Sampley Enterprises, Inc. v. Laurilla, 404 So.2d 841 (Fla. 5th DCA 1981) (damages for lost profits must be capable of ascertainment with only a reasonable degree of certainty; test is satisfied if there is reasonable basis in the evidence for computation of damages, although the result may be only approximate).
There is little doubt that there was evidence to show that the lost profits here alleged were directly caused by Ford's breach of warranty in connection with the sale of its engines, and sufficient proof in the record to establish that Ford's breach caused loss of some reasonably definite amounts of profits. Compare Sampley Enterprises, Inc. v. Laurilla, 404 So.2d 841 (Fla. 5th DCA 1981), and Shidiam Corp. v. M & D Research Corp, 374 So.2d 553 (Fla. 4th DCA 1979), with Crain Automotive Group, Inc. v. J & M Graphics, Inc., 427 So.2d 300, 301 (Fla. 3d DCA 1983), and Myrick v. Miller, 256 So.2d 255 (Fla. 3d DCA 1971). In National Papaya Co. v. Domain Industries, Inc., 592 F.2d 813 (5th Cir.1979), the deficient performance of defendant's machinery caused major production problems for a food processor which, in turn, caused it to lose business. Notwithstanding the serious deficiencies in the method used to calculate damages for lost profits at the trial level, the appellate court ordered a retrial on damages, because it was likely that the lost profits were provable with reasonable certainty. But see Ohoud Establishment For Trade And Contracts v. Tri-State Contracting & Trading Corp., 523 F. Supp. 249 (D.N.J. 1981); Douglass Fertilizers & Chemical, Inc. v. McClung Landscaping, Inc., 459 So.2d 335 (Fla. 5th DCA 1984). Here, Jones' claim for lost profits to be derived from the unconsummated sale of two irrigation systems to two committed and long-standing customers was capable of being proved by competent evidence to a reasonable certainty, and therefore is not speculative.[21]

D.
Lastly Ford claims that the jury was impermissibly allowed to speculate as to the amount of the farmers' damages due to lost crops as well as to the cause or causes of those damages. Again, we do not agree.
Although the appropriate method of calculating damages for injuries to, or destruction of, crops is not agreed upon in the courts, see Annot., 90 A.L.R.3d 800 (1979), and has given rise to "some misgiving in the formulation of general rules respecting the subject, ... there is no doubt that compensation for the real injury is the purpose of all remedies." 21A Am.Jur.2d Crops § 74, at 698 (1981). Florida law clearly permits recovery for loss of prospective profits from the loss of crops. See Twyman v. Roell, 123 Fla. 2, 166 So. 215 (1936). Applying Florida law to a case in which the crop was not completely destroyed, but a lower yield was produced at the end of the season due to another's negligence, the Fifth Circuit in Wm. G. Roe *71 & Co. v. Armour & Co., 414 F.2d 862 (5th Cir.1969), suggested a formula for calculating such damages. Damages under the Roe formula are determined by taking the (expected) normal yield less the amount harvested (less the amount lost due to other causes, for example, a freeze) and reduced by marketing costs, if any, for that portion of the crop destroyed by the injury, calculated on the basis of the average market price for the same crop during the season that the injury occurred. By utilizing this formula, lost profits resulting from crop loss may be estimated with reasonable certainty. The Roe formula has been recognized with approval. See, e.g., Mulford Hickerson Corp. v. Asgrow-Kilgore Co., 282 So.2d 19 (Fla. 4th DCA 1973), quashed on other grounds, 301 So.2d 441 (Fla. 1974)[22]; Decatur County Ag-Services v. Young, 426 N.E.2d 644 (Ind. 1981); Annot., 90 A.L.R.3d 800 (1979); 21A Am.Jur.2d Crops § 79 (1981).
Of course, "[e]ssential to recovery, is initial proof of the fact that damage occurred from defendant's act, not just that it is not exact as to amount." Asgrow-Kilgore Co. v. Mulford Hickerson Corp., 301 So.2d 441, 445 (Fla. 1974). Not only must the measure of damages be calculable to a reasonable certainty, but the cause of the loss must not be speculative. See Asgrow-Kilgore Co. v. Mulford Hickerson Corp., 301 So.2d 441. Ford claims that the causal relation between any negligence on its part and loss of crops is speculative because no evidence was presented to the jury concerning the impact of the climate, the inherent differences among varieties of tomatoes, as well as the influence of other agricultural factors. See Wm. G. Roe & Co. v. Armour & Co., 414 F.2d 862 (under Florida law, where manufacturer's fluorine gas and freeze did not produce single indivisible injury and damage to orange crop from freeze was ascertainable, trial court was entitled to apportion damages and to hold manufacturer liable for less than entire crop loss). The record belies this claim.
The evidence regarding the crop losses of Iori Farms, Inc., Pine Island Farms Enterprises, and International Botanicals, Inc. for the 1975-76, 1976-77 growing seasons consisted of the testimony of Jones' expert (the certified public accountant) and representatives of the three farms. The representatives testified that they suffered lower crop yields which were attributable to faulty irrigation, and each testified that crop damage resulted from a freeze in 1977.[23] The expert, employing the Roe formula, calculated for each growing season the number of acres under the irrigation system times the difference between the expected yield if the system was functioning properly and the actual yield (in boxes per acre) multiplied by the average price per box during that growing season less expenses per box saved in marketing and harvesting the lower yield.
Thus, the evidence below demonstrated the requisite causal connection between the poor irrigation of Iori Farms, Inc., Pine Island Farms Enterprises, and International Botanicals, Inc. and the reduced crop yields. Furthermore, the lost profits owing to reduced yields were capable of proof to a reasonable degree of certainty. It was Ford's burden to prove the amount of damage attributable to the freeze,[24] and any failure to apportion the damages attributable to the 1977 freeze is owing to Ford's failure to carry this burden. Therefore, these three farmers' claims for lost profits from lost crops are not "speculative," and evidence relating to these claims was properly considered against Ford and may, of course, be considered *72 at the new trial against both Ford and H & M.

III.
We also hold that the trial court's stated basis for its order of remittitur reducing the $260,000 jury verdict in favor of Jones is legally insufficient because it does not specify matters which occurred during trial that indicated that the jury was improperly influenced or that the verdict was excessive by $130,000.[25]See Wackenhut Corp. v. Canty, 359 So.2d 430 (Fla. 1978); Laird v. Potter, 367 So.2d 642 (Fla. 3d DCA), cert. denied, 378 So.2d 347 (Fla. 1979). See also Waltman v. Prime Motor Inns, Inc., 446 So.2d 185 (Fla. 3d DCA 1984). Because it cannot be said that the amount of the verdict is such as to shock the conscience of the court and because the excessiveness of the verdict is neither apparent nor ascertainable from the record, the trial court's order of remittitur constitutes an abuse of discretion. See Wackenhut Corp. v. Canty, 359 So.2d 430.

IV.
Because the general verdict returned by the jury necessarily includes damages pertaining to the limitations-barred claims, we cannot direct the reinstatement of the verdict despite our conclusion that the remittitur was unjustified. Instead, we order a new trial between Jones and Ford to determine the damages sustained by Jones and its assignor-farmers, Iori Farms, Inc., Pine Island Farms Enterprises, and International Botanicals, Inc. Jones is also entitled to a trial against H & M on the issues of liability and damages. As we have said, evidence relating to Jones' claim for lost profits on the two sales ultimately consummated by Glade and Grove Supply, as well as evidence relating to these farmers' lost profits owing to lost crops, is admissible at the trial against both defendants.
Reversed and remanded for further proceedings in accordance with this opinion.
NOTES
[1] The growing season ran from the fall of 1975 through the spring of 1976.
[2] Apparently, those engines used in overhead irrigation systems and one used in a drip system irrigating lesser acreage performed satisfactorily.
[3] In May 1976, Ford informed Jones that the cause of the problem was that the farmers were using the wrong type of oil. Jones' inspection of the oil used revealed that it conformed to specifications and was in fact initially placed in the engines by H & M.
[4] The nine assignors were: Pine Island Farms Enterprises, International Botanicals, Inc., Joseph Pratt, Strano Farms, Inc., Costa Nursery Farms, Inc., Miguel Costa, Iori Farms, Inc., L & D Farms, and D & S Farms.
[5] At trial, expert witnesses called by Jones testified that Ford was negligent in its design; Ford's experts testified that Jones' design of the system caused the engines to be overworked.
[6] Section 672.314, Florida Statutes (1975), states:

"(1) Unless excluded or modified (s. 672.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
"(2) Goods to be merchantable must be at least such as:
"(a) Pass without objection in the trade under the contract description; and
"(b) In the case of fungible goods, are of fair average quality within the description; and
"(c) Are fit for the ordinary purposes for which such goods are used; and
"(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
"(e) Are adequately contained, packaged, and labeled as the agreement may require; and
"(f) Conform to the promises or affirmations of fact made on the container or label if any.
"(3) Unless excluded or modified (s. 672.316) other implied warranties may arise from course of dealing or usage of trade."
[7] Section 672.315, Florida Statutes (1975), provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."
See Beede Electrical Instrument Co. v. K.E.S., Inc., 433 So.2d 59 (Fla. 3d DCA 1983).
[8] Robert Jones testified that he became aware of the engine problems in October-November 1975. Richard Jones testified that he learned of difficulties in November/December 1975-January 1976.
[9] The "relation-back" approach of Smith can apply only where the court subsequently grants the motion for leave to amend. It leaves unanswered what happens where the court denies the motion. Compare Charpentier v. Young, 403 Mich. 851, 291 N.W.2d 926 (1978), and Fazzalare v. Desa Industries, Inc., 135 Mich. App. 1, 351 N.W.2d 886 (1984), in which the courts held that the statute of limitations is tolled by the filing of a motion for leave to amend the complaint until such time as the motion is ruled upon  either favorably or unfavorably. This removes the problem of a trial court's delay affecting the outcome of the case.
[10] We note that Smith v. Metropolitan Dade County, 338 So.2d 878, is in direct conflict with the Fourth District Court of Appeal decisions in Warner-Lambert Co. v. Patrick, 428 So.2d 718 (Fla. 4th DCA 1983), and Florida Power & Light Co. v. System Council U-4 of the It'l Brotherhood of Electrical Workers, AFL-CIO, 307 So.2d 189 (Fla. 4th DCA 1975), which hold that the plaintiff must obtain leave of court to file an amended complaint as a precondition to its filing, without which the amended complaint is a nullity. See Leathers v. Serrell, 376 F. Supp. 983, 984 n. 1 (W.D.Va. 1974) (amended complaint deemed filed on date which motion to amend original complaint granted by order of court).
[11] The attempted repairs of the engines by Ford and H & M do not toll the statute of limitations. See K/F Development & Investment Corp. v. Williamson Crane & Dozer Corp., 367 So.2d 1078 (Fla. 3d DCA), cert. denied, 378 So.2d 350 (Fla. 1979), approved in Kelley v. School Board of Seminole County, 435 So.2d 804 (Fla. 1983).
[12] Our review of the record indicates that: Iori Farms, Inc. purchased two other engines from Jones on January 23, 1976; Pine Island Farms Enterprises purchased one engine on January 23, 1976; and International Botanicals, Inc. purchased one engine on March 11, 1976. Since each of these engines was purchased after December 31, 1975, the farmers could not possibly have discovered any defects in the engines prior to that date. The remaining six assignor-farmers, as well as Iori Farms, Inc., bought engines from Jones at various times between November 18, 1974, and December 4, 1975. The testimony of the representatives of these farms indicates that problems with these engines "started right away," were "almost immediate," or occurred "several days post hook-up." The only reasonable inference that can be drawn from this evidence is that these farmers discovered or should have discovered the defects which constituted Ford's breach of warranty prior to December 31, 1975, and, accordingly, their claims were not timely asserted in Jones' amended complaint. See Kelly Tractor Co. v. Gurgiolo, 369 So.2d 992 (Fla.3d DCA 1979). Compare Cowan v. Turchin, 270 So.2d 449 (Fla. 4th DCA 1972).
[13] The authors' comment states:

"The principle of relation back of amended pleadings existed in prior law, but it was limited to an amendment which did not state a new cause of action. The harshness of the rule was modified by a liberal construction of a `cause of action.' In accord with this liberal application of the principle, the rule requires only that the amendment arise out of the `conduct, transaction, or occurrence' set forth in the original pleading."
[14] The companion principle is that a complaint may be amended to reflect a plaintiff's change of capacity. See Griffin v. Workman, 73 So.2d 844 (Fla. 1954); Lindy's of Orlando, Inc. v. United Electric Co., 239 So.2d 69 (Fla. 4th DCA), cert. denied, 242 So.2d 463 (Fla. 1970); Haines v. Leonard L. Farber Co., 199 So.2d 311 (Fla. 2d DCA 1967), cert. dismissed, 210 So.2d 218 (Fla. 1968). "The mere substitution of a parties plaintiff [sic], without substantial or material changes from the claims of the original petition, does not of itself constitute setting forth a new cause of action in the amended petition." Griffin v. Workman, 73 So.2d at 847 (quoting Douglas v. Daniels Bros. Coal Co., 135 Ohio St. 641, 647, 22 N.E.2d 195, 198 (1939)) (emphasis supplied). However, the "identity of interest" concept, applicable here too, requires that the original and substituted parties be so closely related in business or other activities so as not to offend notions of notice or prejudice the opposition. Williams v. Jerry L. Kaltenbach Ent., Inc., 2 Ohio App.3d 113, 440 N.E.2d 1219 (1981). See Foss v. Mansell, 378 So.2d 802 (Fla. 3d DCA 1979), wherein this court considered the issue of whether an assignment relates back to the original complaint or whether it constitutes a new cause of action. Foss, the appellant and a partner in a law firm, performed 99% of the legal services for Mansell. The rights to the fee had been assigned by the firm to Foss individually. This assignment was incorporated in Foss' amended complaint for breach of contract against Mansell. Mansell raised the affirmative defense of statute of limitations, arguing that the assignment constituted the introduction of a new party plaintiff and a new cause of action. The factors which prompted the court's determination that this was an amendment which related back to the original filing were: (1) Mansell's awareness that Foss was a partner in the law firm; (2) assignments for purposes of collecting legal fees are commonplace; and (3) there was no prejudice or surprise to Mansell owing to the assignment. Furthermore, the court in Mansell believed that the assignment was in effect a substitution of parties.
[15] The court expressly declined to decide whether the outcome would differ had the son's next friend been an unrelated person, such as a corporate fiduciary.
[16] This is much the same rationale that permits liberal post-limitations period amendment of complaints to include additional plaintiffs and concomitant enlargement of damages in wrongful death actions. See, e.g., Peters v. Mitchel, 423 So.2d 983 (Fla. 3d DCA 1982); Dye v. Houston, 421 So.2d 701 (Fla. 1st DCA 1982); Handley v. Anclote Manor Foundation, 253 So.2d 501 (Fla. 2d DCA 1971), cert. denied, 262 So.2d 445 (Fla. 1972). But see School Board of Broward County v. Surette, 394 So.2d 147 (Fla. 1st DCA), rev. dismissed, 399 So.2d 1146 (Fla. 1981). That the wrongful death action presents a unique situation is implicit in this court's decision in Talan v. Murphy, 443 So.2d 207 (Fla. 3d DCA 1983), rev. denied, 451 So.2d 849 (Fla. 1984), which holds that amendment of a complaint after expiration of the limitations period seeking additional damages for the deceased minor's mother, loss of the minor's net accumulations, and medical and funeral expenses was proper because the statutory mechanism for bringing a wrongful death action, § 768.20, Fla. Stat., mandates that a single cause of action be brought by the personal representative claiming each survivor's damages, as well as the expenses incurred by the estate.
[17] The court conceded that it would have difficulty in allowing amendment to add an entirely unrelated party even though its claims arose from the same transaction.
[18] Jones' expert, a certified public accountant, arrived at Jones' gross profit loss by multiplying R.A. Jones' customary mark-up (twenty-five per cent) by the total purchase price paid for the two irrigation systems by the two farmers to Glade and Grove Supply. This calculation accounts for the direct cost of the merchandise including any direct labor cost involved in setting up the system (excluding any overhead or expense factors), and is based upon the assumption that Jones sold these systems at the same or at a slightly lower price than Glade and Grove Supply.
[19] proving a claim for loss of profits of an established business the record of past profits is usually the best available evidence. Since in a new business no record of past profits exist [sic], it is much more difficult to make out with sufficient certainty a claim for loss of profits of a new venture. Past profits must usually be shown from the books of the business, and mere `estimates' of witnesses will not serve if books were kept. Opinions of witnesses as to the amount of profits that would have been gained are not admissible, except where the opinion is that of an expert based upon relevant facts."
Belcher v. Import Cars, Ltd., 246 So.2d 584, 586 (Fla. 3d DCA), cert. denied, 252 So.2d 801 (Fla. 1971) (quoting C. McCormick, Damages § 29, at 107 (1935)).
See 25 C.J.S. Damages § 42 (1966).
[20] The two farmers had previously purchased drip irrigation systems from Jones. They testified that they had purchased solid set sprinkler irrigation for frost protection from Glade and Grove Supply, after having received a lower price quotation on the same equipment from Jones, because of their earlier bad experience with the drip systems. See National Papaya Co. v. Domain Industries, Inc., 592 F.2d 813 (5th Cir.1979) (Florida law tolerates less certainty with regard to showing that lost profits flowed as a natural and proximate result of defendant's wrongful conduct; the uncertainty which defeats recovery is uncertainty as to the cause of damage rather than amount thereof).
[21] This same evidence relating to lost profits may, of course, be considered in respect to Jones' claim against H & M.
[22] Mulford (despite its quashal), along with Roe and Twyman, were cited by this court in Agricultural Alumni Seed Improvement Ass'n v. Jackson, 393 So.2d 45 (Fla. 3d DCA 1981).
[23] There was testimony that crop losses occurred because the irrigation system, needed to protect the crop from freeze damage, shut down during the freeze.
[24] This rule protects the plaintiff "against any uncertainty encountered in ascertaining damages." See Wm. G. Roe & Co. v. Armour & Co., 414 F.2d at 871.
[25] The trial court reasoned as follows:

"THE COURT: I've already indicated that I was probably going to reduce the figure, because I understand the mechanics of an engine and I've been familiar with it and I've been a mechanic for quite sometime and I have a power plant license, so I'm familiar with 
... .
"THE COURT: I'm going to reduce the verdict to $125,000. I'll reduce it, because I look at it this way: The only element was that Ford delayed doing something. In the meantime, the farmers were suffering, see. And they did send a rep down in January to look at the item and there was no further response. In the meantime, the farmers are down and the engines are not operating properly. And I think all you had to do is pick up a phone and say, look, it's not our fault, it's your fault. You're overloading these engines, see.
... .
"THE COURT: Well, I think I'll probably grant the remittitur to $130,000.
"Because I look at it this way: The jury has heard everything during the course of the trial concerning the assignments, concerning the loss that Mr. Jones, he as an individual sustained, concerning the loss of the farmers, the sixth or ninth largest farmers in Dade County that purchased these engines. They heard that one farmer, whose engine is still performing, has 2500 hours on one of these particular engines, was working fine since it was working on a twenty acre plot rather than a forty acre.
... .
"THE COURT: $130,000. That's a reasonable figure. When you consider all aspects of this particular case, the losses sustained in this matter."